**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:26-cr-59** |
| | : | |
| **v.** | : | **Judge Algenon L. Marbley** |
| | : | |
| **YEIBER ANTONIO VILLAMIZAR-BECEIRA,** | : | |
| | : | |
| **Defendant.** | : | |

# OPINION AND ORDER

This matter comes before the Court on Defendant Yeiber Antonio Villamizar-Beceira's Motion to Suppress (ECF No. 33) a firearm and ammunition recovered from his car, as well as his statements made to police during a traffic stop that occurred on February 11, 2026 in Noble County, Ohio. The Court held a Suppression Hearing on July 15, 2026. At that hearing, both the Defendant and the Government introduced evidence and testimony. The Government called Noble County Sheriff Deputies Jacob Black and Jack Ridenour, and the Defendant testified on his own behalf.

For the following reasons, Defendant's Motion to Suppress is **DENIED**.

## I. BACKRGOUND

### A. Factual Background

#### *1. Testimony of Deputies Black and Ridenour*

The testimony presented by Deputies Black and Ridenour provided the following narrative. At approximately 11:30 p.m. on the night of February 11, 2026, Deputy Black was driving southbound on a stretch of highway in Noble County, Ohio in a marked patrol car when he observed a blue Honda Civic commit a marked lane violation just ahead of him by traveling over the dashed line between the two southbound lanes on Interstate 77. (Suppression Hr'g Tr., ECF No. 46 at 5–

6). The Honda had temporary Georgia tags and was being driven by Defendant Villamizar-Beceira. (*See* ECF No. 47-1 at 3). There was also a passenger in the front of the car.

Deputy Black initiated a traffic stop for the violation, but the Honda continued driving for approximately a half-mile before finally coming to a stop along the side of the highway. According to Deputy Black, there was no obvious reason why the Honda would continue on for so long before halting—weather conditions were clear, the stretch of highway was not busy with other traffic, and the Honda ultimately stopped on the shoulder of the highway, rather than pulling into a gas station or rest area further away from traffic. (ECF No. 46 at 7–11).

During that half-mile, Deputy Black observed "a significant amount of movement inside the vehicle," including movement on the part of Villamizar-Beceira and movement suggesting that the passenger had placed something on the car's floorboard. (*Id.* at 8). The Honda stopped and Deputy Black initiated contact with its two occupants, requesting their license, registration, and proof of insurance. The interaction was not recorded, as the Noble County Sheriff's Department does not equip law enforcement with body-worn or dashboard-mounted cameras. (*Id.* at 10, 12). Deputy Black was able to identify the passenger, but was unable to identify Villamizar-Beceira by the name he provided. Villamizar-Beceira stated that he did not have a valid driver's license, explaining that he was from Venezuela but moved to Georgia and had a Georgia identification. (*Id.* at 12–14, 38). During the interaction, Deputy Black noticed that the passenger was more nervous than the "normal nervousness of a traffic stop"; he kept fidgeting, rubbing his hands together, and was breathing rapidly. Around this same time, Deputy Ridenour arrived on the scene as backup. Deputy Black asked Villamizar-Beceira to step out of the vehicle so that he could be identified. (*Id.* at 14).

Once Villamizar-Beceira was out of the vehicle, Deputy Black resumed questioning him. At this point, Villamizar-Beceira started to appear nervous, too—he started swaying back and forth,

shifting his weight, and turning away from Deputy Black. While they waited on results for Villamizar-Beceira's provided identity, Deputy Black asked him whether there were illegal firearms or narcotics in his vehicle. Villamizar-Beceira stated that there were not and consented to a search of the vehicle. (*Id.* at 17–18, 20–21). At that time, the passenger exited the vehicle and waited with Deputy Ridenour and Villamizar-Beceira by Deputy Black's police car, while Deputy Black commenced a search of the Honda.[1] (*Id.* at 19). It had been approximately twenty minutes since the traffic stop commenced. (*Id.* at 75).

During that search, Deputy Black discovered a sock under the driver's seat of the vehicle. The sock contained thirty-seven 9mm rounds of ammunition. Under a plastic panel on the passenger side of the vehicle, Deputy Black discovered a Glock 19 handgun and a magazine loaded with additional 9mm rounds. He photographed and collected these items and returned to Villamizar-Beceira and the passenger after concluding his search of the vehicle, advising Deputy Ridenour that they would need to detain the men. (*Id.* at 23–25, 33). Then, Deputy Black placed both men in handcuffs and advised them that they were being detained; he then read them their *Miranda* rights, at which point the two men confirmed in English that they understood the *Miranda* warnings and were willing to answer questions. (*Id.* at 25–26, 29, 108).

The deputies separated the men into the two police cars and Deputy Black began by first questioning the driver, Villamizar-Beceira. (*See id.* at 112–13). Villamizar-Beceira informed Deputy Black that he had found the ammunition and was taking it back to Georgia to sell it. When Deputy Black asked him about the firearm, however, Villamizar-Beceira indicated that he did not understand, and requested a phone for translation. Deputy Black proceeded to use Google Translate

[1] Deputy Black testified that he had received a four-day training on interdiction that covered suspect behaviors and hidden compartments within vehicles. (ECF No. 46 at 46).

and Villamizar-Beceira denied knowledge of the firearm. (*Id.* at 26–27, 32). When the passenger was questioned, he confirmed that the ammunition belonged to Villamizar-Beceira before also stating that he did not understand questions about the firearm. Deputy Black again used Google Translate, and through the translation application, the passenger admitted that Villamizar-Beceira had roused him from sleeping, handed him the Glock 19, and instructed him to hide it because they were being pulled over. (*Id.* at 37–38).

***2. Testimony of Defendant Villamizar-Beceira***

Villamizar-Beceira's testimony provided a different account of the facts of the traffic stop. First, he testified that the deputies should have known he did not understand them because he kept gesturing and emphasizing that he did not follow their questioning. (*Id.* at 146–47). In his telling, he was placed in the back of a patrol car after being removed from his Honda, did not understand that Deputy Black wanted to search his Honda and never consented to such a search, and kept emphasizing that he did not understand English. (*Id.* at 148–52). Contrary to the testimony of Deputies Black and Ridenour, Villamizar-Beceira stated that both Black and Ridenour searched his Honda and then began to question them about the bullets and firearm before they were advised of their *Miranda* rights. He states that he was provided his *Miranda* rights by being shown an image of those rights in Spanish through a web browser search. He testified that once he understood he had the right to remain silent, he decided to exercise that right "because [he] wasn't aware of this right that [he] had." (*Id.* at 152–56).

Villamizar-Beceira also provided testimony on several important aspects of his background. He explained that he was born in Venezuela but also was a Colombian national, had been in the United States for three years and considered Georgia home, and had been in Ohio for six months prior to his arrest because he was working in construction in Cleveland. (*Id.* at 142–43, 160). His

boss in Cleveland did not speak Spanish, and he sometimes would spend time with his boss and his boss's family. He had completed high school in Medellin at an "English-medium school" where instruction was in English, yet he claimed that his comprehension of English was only at either five or ten percent, explaining that he "could understand some things" in English. (*Id.* at 143–44, 160). On direct examination, he testified that he had "been pulled over many times for traffic violations," and thus could understand some of Deputy Black's questioning when he asked for a driver's license. (*Id.* at 147). Later, on cross examination, he testified that he had been pulled over twice, and was arrested once in Georgia and spent the night in jail because he did not have a driver's license. (*Id.* at 165–66). His *Miranda* rights were read to him in English during that Georgia arrest. (*Id.* at 166).

Two final, notable facts arose during the Suppression Hearing. The first is that Villamizar-Beceira has a tattoo on his neck that says "You will shine" in English. (*Id.* at 167). The second is that despite having an interpreter, Villamizar-Beceira answered a question in English during direct examination before the interpreter had translated the question for him into Spanish. (*Id.* at 143).[2]

**B. Procedural Background**

On March 17, 2026, the Government filed a criminal complaint against Villamizar-Beceira for being an alien illegally or unlawfully in the United States in possession of ammunition. (ECF No. 4 at 1). A grand jury charged Villamizar-Beceira with one count in violation of 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(8). The Government seeks forfeiture of the firearm and associated ammunition. (ECF No. 19 at 1–2). The final pretrial conference in this matter was held on July 20, and a jury trial is scheduled to begin on July 29, 2026. (ECF No. 28).

[2] **DEFENSE COUNSEL:** And how long have you been in Ohio before you were arrested on this case?
**VILLAMIZAR-BECEIRA:** (In English.) Six months.

On June 15, 2026, Villamizar-Beceira filed the instant Motion to Suppress, arguing that the stop and search of his vehicle violated the Fourth Amendment, while his statements were elicited by law enforcement in violation of the Fifth and Sixth Amendments. He also requested an evidentiary hearing. (ECF No. 33). The Government opposed suppression. (ECF No. 35). The Court held the Suppression Hearing on July 15 and ordered supplemental briefing. The parties submitted their additional memoranda on July 22. (ECF Nos. 47; 48).

## II. STANDARD OF REVIEW

### A. Fourth Amendment

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures by the Government. It provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. To comply with the Fourth Amendment, law enforcement generally must obtain a warrant, supported by probable cause and from a "neutral and detached" judicial officer, before searching people, homes, or property for evidence of criminal wrongdoing. *Riley v. California*, 573 U.S. 373, 283 (2014) (citation and internal quotation marks omitted); *see Kentucky v. King*, 563 U.S. 452, 459–60 (2011). These requirements "guarantee[] the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government or those acting at their direction." *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 613–14 (1989). When law enforcement violates these requirements, "courts generally suppress the resulting evidence." *United States v. Bateman*, 945 F.3d 997, 1005 (6th Cir. 2019). Warrantless searches and seizures are presumptively unreasonable, but there are several exceptions to the warrant requirement. *King*, 563 U.S. at 459. One such exception permits law enforcement to search vehicles—and containers inside them—given that vehicles otherwise could "be quickly moved out

of the locality or jurisdiction in which the warrant must be sought." *California v. Acevedo*, 500 U.S. 565, 569, 572 (1991) (citation and internal quotation marks omitted).

### B. Fifth Amendment

The Fifth Amendment protects against self-incrimination to the targets of Government investigations. It guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. The "core protection" of this self-incrimination clause "is a prohibition on compelling a criminal defendant to testify against himself at trial." *United States v. Patane*, 542 U.S. 630, 637 (2004) (plurality opinion). But because "the possibility of coercion inherent in custodial interrogations unacceptably raises the risk that a suspect's privilege against self-incrimination might be violated," the Supreme Court created a presumption of coercion absent specific warnings. *Id.* at 639. These warnings, which are "absolute prerequisite[s] to interrogation," inform the suspect that he has the right to remain silent, that anything he says can and will be used against him in court, that he has a right to consult with an attorney, and that an attorney will be appointed to represent him if he cannot afford one. *Miranda v. Arizona*, 384 U.S. 436, 444–45, 467–73 (1966). When an officer fails to inform a suspect of his *Miranda* rights, the suspect's unwarned statements may not be admitted at trial. *United States v. Burton*, 828 F. App'x 290, 292 (6th Cir. 2020) (citing *Miranda*, 384 U.S. at 492).

## III. LAW & ANALYSIS

Villamizar-Beceira's Motion to Suppress challenges both the seizure of his person and the search of his car, as well as the introduction of his statements made to law enforcement. He seeks to suppress all evidence obtained from the car and all his statements made to law enforcement. (ECF No. 33 at 3–6). The Court considers each argument in turn.

**A. Search and Seizure**

Ordinary traffic stops are seizures for Fourth Amendment purposes. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Thus, evidence seized from illegal traffic stops "must be suppressed as fruits of the poisonous tree." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citation and internal quotation marks omitted); *see Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963). In bringing this Fourth Amendment challenge, Villamizar-Beceira bears the initial burden of proof to show a violation justifying suppression. *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003). This burden encompasses both "production and persuasion." *United States v. Rowe*, 2026 WL 507414, at *3 (S.D. Ohio Feb. 24, 2026) (Marbley, J.) (quoting *United States v. Patel*, 579 F. App'x 449, 453 (6th Cir. 2014)). Should he satisfy this initial burden, the Government must then "demonstrat[e] an exception to the warrant requirement." *Taylor v. City of Saginaw*, 922 F.3d 328, 334 (6th Cir. 2019).

Law enforcement may lawfully stop a car when they have probable cause to believe that a crime or a civil traffic violation is occurring or has occurred. *United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012). The infraction need not be severe, *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008); *accord United States v. Stevenson*, 43 F.4th 641, 645 (6th Cir. 2022) (citing *Blair*, 524 F.3d at 748), and the probable cause requirement is not a high bar. Probable cause exists where there are "facts and circumstances" sufficient that a "prudent person" would be warranted to believe that a "suspect has committed, is committing, or is about to commit an offense." *Stevenson*, 43 F.4th at 645 (citations and internal quotation marks omitted). It is a "practical and common-sense standard based on the totality of the circumstances," and allows for "certain reasonable mistakes." *Id.* (citations and internal quotation marks omitted). Thus, if Deputy Black had probable cause to believe a traffic violation had occurred, he could lawfully stop the Honda Civic.

Villamizar-Beceira concedes that Deputy Black had a basis to initiate the traffic stop, and there is no question whether the initial stop was lawful. Instead, Villamizar-Beceira argues that the search itself was not lawful. (ECF No. 47 at 1–6). Acknowledging that the issue of the search's legality largely "come[s] down to a credibility determination," Villamizar-Beceira suggests that his recollection and testimony regarding the search is more likely to be accurate than the "remarkably identical" testimony of Deputy Black and Deputy Ridenour, as he was "arrested and imprisoned for the first time in his life" and has that evening "seared into his memory." (*Id.* at 1–2). He questions the credibility of Black and Ridenour, doubting that they really failed to see that he had a Spanish accent and was of foreign origin. (*Id.* at 2). Additionally, he argues that he did not consent to a search of his vehicle, the stop was unreasonably prolonged, and the search was unreasonable in its extension to the location of the firearm. (*Id.* at 3–6).

For its part, the Government agrees that suppression hinges on the Court's evaluation of witness credibility. (ECF No. 48 at 1). The Government rejects Villamizar-Beceira's contention that the deputies knew he could not understand them or consent to a search, countering that there is no evidence of misconduct by law enforcement here. (*Id.* at 4).

When the Government asserts consent to a search, it "must prove through clear and positive testimony that the consent was voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *United States v. Ceja-Torres*, 2025 WL 2092505, at *3 (6th Cir. July 25, 2025) (citations and internal quotation marks omitted). To evaluate consent, courts consider "the defendant's age, intelligence, and education, as well as the length and nature of the detention and coerciveness of the questioning." *Id.* If the defendant and law enforcement "speak different languages, 'the quality and appropriateness of a translation is an important consideration for a reviewing court in determining whether consent was voluntary.'" *Id.* (quoting *United States*

*v. Hernandez*, 443 F. App'x 34, 41 (6th Cir. 2011)). Both the inquiry into the voluntariness of consent and the propriety of any translation are "question[s] of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). The trial court's credibility findings in evaluating witnesses are given "particular deference." *United States v. Lopez-Medina*, 461 F.3d 724, 737 (6th Cir. 2006).

Sixth Circuit jurisprudence provides a variety of factors to consider when evaluating whether a language barrier between a defendant and a law enforcement officer invalidates consent. These factors include: (1) any "obvious" or "demonstrate[d]" confusion on the part of the defendant when trying to communicate; (2) the appropriateness of the defendant's responses to the questions; (3) the law enforcement officer's use of "direct" language to avoid confusion; and (4) the law enforcement officer's experience using the translation method with other speakers of that language. *Ceja-Torres*, 2025 WL 2092505, at *3. Particularly where the interaction is not recorded, this Court must review these factors with an eye toward the credibility of witnesses. *United States v. Ayoub*, 498 F.3d 532, 542–43 (6th Cir. 2007) (affirming district court's conclusion that defendant consented where she "nodded her head in understanding," appeared to understand "what was going on," remained calm and cooperative, and could understand law enforcement even if her ability to communicate was "broken" and her daughter "did some translating during the discussion").

Here, Villamizar-Beceira's consent to search the Honda was voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion. The Court credits the testimony of Deputies Black and Ridenour, who presented a consistent picture of both Villamizar-Beceira and his passenger understanding and speaking English. Villamizar-Beceira's testimony to the contrary is self-serving, contradictory, and ultimately not credible. The Court does not believe that Villamizar-Beceira's English proficiency is so lacking that he could not understand Deputy

Black's questioning or that he was being asked to consent to a search of the Honda. Thus, there is no need for the Court to probe a language barrier between the defendant and law enforcement because there does not appear to be any legally significant communication issue in this case. By Villamizar-Beceira's own testimony, it is evident that Villamizar-Beceira could understand direct English questioning by his own defense counsel and responded in English before his interpreter could relate the question to him in Spanish. He has a tattoo on his neck in English. He has lived in the United States for over three years, and during that time traveled between Georgia, Texas, and Ohio. He worked in Cleveland for four months and reported to a boss who did not speak Spanish, and on occasion would dine with his boss's family. He attended an English-language school in Colombia, and admits that he has at least some proficiency in English. Last, he has been subject to traffic stops at least twice before, if not more than that (his testimony varies), and was previously arrested during a traffic stop in Georgia.

Villamizar-Beceira's attacks on the credibility of Deputies Black and Ridenour are not convincing. There is no basis for the Court to believe that they should have understood Villamizar-Beceira's accent as Spanish based on his limited communication during the traffic stop, and he does not offer any evidence for why they should have been able to grasp his Hispanic origin based on a twenty-minute traffic stop at night. As the deputies explained, Noble County is small, with a total population of approximately 14,000 people (including several thousand prison inmates). (ECF No. 46 at 98; *see id.* at 128–29 (Deputy Ridenour testified that Villamizar-Beceira had an accent, but he could not place it)). Or as Villamizar-Beceira himself testified when discussing his prior experience with American law enforcement, "[t]here are few officers in the United States that speak Spanish." (*Id.* at 166).

And to the extent that Villamizar-Beceira argues that any nervousness on his or his passenger's part could not be relied upon by Deputy Black, (ECF No. 47 at 5–6), that is beside the point. True, "nervousness alone is insufficient to establish probable cause," *United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012), as many people "become nervous during a traffic stop, even when they have nothing to hide or fear," *United States v. Richardson*, 385 F.3d 625, 630–31 (6th Cir. 2004). But in this case, Villamizar-Beceira does not dispute the lawfulness of the initial traffic stop. Because he consented to a search of his vehicle, any suspicion Deputy Black may have had due to his alleged nervousness is beside the point.

Finally, Villamizar-Beceira suggests that the twenty minutes for Deputy Black to elicit his consent to search the vehicle amounts to an unreasonable delay in the traffic stop. As a matter of law, it does not. Twenty-one minutes is generally "not an unreasonable amount of time" for law enforcement to complete a traffic stop, and a traffic stop detention can exceed the amount of time needed for a traffic stop should law enforcement become "justified in continuing their investigation." *United States v. Collazo*, 818 F.3d 247, 257–59 (6th Cir. 2016). This amount of time is all the more reasonable given Villamizar-Beceira was providing Deputy Black with fake names. (*E.g.*, ECF No. 46 at 148).

In sum, Villamizar-Beceira's consent was valid. The evidence suggests that when Deputy Black initiated the traffic stop, Villamizar-Beceira waited for his passenger to hide the firearm before pulling over. Once he pulled over, he consented to the search of his vehicle, understanding that Deputy Black was concerned about drugs and firearms and believing that his Glock 19 was hidden. The record also suggests that Villamizar-Beceira only stopped speaking with Deputy Black once he learned that the firearm was discovered. At that point, Villamizar-Beceira seemingly lost his ability to communicate in English. Deputy Black testified that Villamizar-Beceira consented to

the search of the car, and the Court finds that testimony more credible than Villamizar-Beceira's testimony to the contrary. The firearm and ammunition discovered in the Honda are admissible.

**B. Statements to Law Enforcement**

Villamizar-Beceira also seeks to suppress statements made to law enforcement, arguing that the *Miranda* warning he received was ineffective because he could not understand it and because it was delivered after he was questioned. (ECF No. 47 at 6). He bears the initial burden of proof under the Fifth Amendment. He must show that he was "subjected to a custodial interrogation, and thus entitled to *Miranda* warnings in the first place," and if he does, the burden shifts to the Government to show a knowing and voluntary waiver. *Rowe*, 2026 WL 507414, at *3 (citation omitted).

Because Villamizar-Beceira was asked about the bullets after he had been handcuffed and placed in the back of the police cruiser, both he and the Government agree that he was in custody for the purposes of the *Miranda* warning. Instead, they dispute whether Deputy Black's *Miranda* rights warning was properly given. (*Compare* ECF No. 33 at 4–6 *with* ECF No. 35 at 7–8).

A suspect's statements made in response to a custodial police interrogation "must be suppressed unless the suspect first waived his *Miranda* rights 'voluntarily, knowingly, and intelligently.'" *United States v. Ray*, 803 F.3d 244, 266 (6th Cir. 2015) (Marbley, J., by designation) (citations omitted). Such a waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception . . . made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). The crucial inquiry is not whether the suspect "knew and understood every possible consequence of a waiver, but rather whether he knew that he could 'choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue

talking at any time.'" *United States v. Lawrence*, 735 F.3d 385, 437 (6th Cir. 2013) (citations omitted). Language difficulties "may impair the ability of a person in custody to waive his *Miranda* rights in a free and aware manner." *United States v. Al-Cholan*, 610 F.3d 945, 954 (6th Cir. 2010) (citation omitted; cleaned up). An inquiry into waiver validity considers the totality of the circumstances. *Ray*, 803 F.3d at 266.

The "voluntariness and comprehension aspects of the waiver inquiry" are "examined primarily from the perspective of the police, such that where the police had no reason to believe that the defendant misunderstood the warnings, there is no basis for invalidating the *Miranda* wavier." *Al-Cholan*, 610 F.3d at 954 (citations omitted; cleaned up). As discussed, the Court credits the testimony of Deputies Black and Ridenour and accepts that Villamizar-Beceira received an instruction on his *Miranda* rights before he was questioned. The question is simply whether he understood those rights.

In evaluating whether a suspect's lack of language skills could render his waiver of *Miranda* rights ineffective, courts may consider:

> (1) whether the defendant signed a written waiver; (2) whether the defendant was advised of his rights in his native tongue; (3) whether the defendant appeared to understand his rights; (4) whether [the] defendant had the assistance of a translator; (5) whether the defendant's rights were individually and repeatedly explained to him; and (6) whether the defendant had prior experience with the criminal justice system.

*United States v. Villa-Casteneda*, 755 F. App'x 511, 518 (6th Cir. 2018) (quoting *United States v. Garibay*, 143 F.3d 534, 539 (9th Cir. 1998)). The Sixth Circuit has suggested that suppression is proper where none of those considerations is present. *See id.*

Here, Villamizar-Beceira appeared to understand his rights and had prior experience with the criminal justice system, so the third and sixth considerations weigh against suppression. Deputy Black testified that he did not believe Villamizar-Beceira to be a limited English speaker because

Villamizar-Beceira spoke in full sentences and understood his questions, at least until asked about the firearm. (ECF No. 46 at 16, 35, 66). Deputy Ridenour's testimony confirmed that Villamizar-Beceira spoke in complete English sentences. (*Id.* at 104–06; *see id.* at 124, 133–34). Again, Villamizar-Beceira's testimony does not contradict the testimony of law enforcement—it reinforces it. Part of his testimony was in English. He has a tattoo in English. He has lived in the United States for over three years, and previously worked for an employer who did not speak Spanish. He attended an English-language school and admitted to some proficiency in English. Last, he was arrested in Georgia and conceded that his *Miranda* rights were read to him during that arrest in English. Villamizar-Beceira's waiver of his *Miranda* rights was effective, and suppression of his statements would be improper.

## IV. CONCLUSION

For the foregoing reasons, Defendant Villamizar-Beceira's Motion to Suppress (ECF No. 33) is **DENIED**.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: July 28, 2026**